[No. 13701.   Department Two.   March 24, 1917.]

William N. Hess, *as Hess Creamery Company, Respondent,* v. I. Seitzick *et al., Appellants.*[1]

Sales—Breach by Purchaser — Measure of Damages.   Where, upon the sale of butter subject to inspection, the buyer rejected it and the vendor elected to retain it, the measure of damages for the purchaser's breach of contract is the difference between the contract price and the market price at the time and place of delivery.

Same—Breach—Measure of Damages—Price on Resale.   Upon breach of contract for the sale of butter, rejected by the buyer, the price received on resale, without notice, upon a declining market, three months after rejection, does not bind the buyer, where there was evidence that it could have been resold at and after the time of the rejection for more than the contract price; since the resale must be made within a reasonable time.

Appeal from a judgment of the superior court for King county, Albertson, J., entered March 21, 1916, upon the verdict of a jury rendered in favor of the plaintiff, in an action on contract, after a trial on the merits.   Reversed.

*E. L. Skeel* and *W. M. Whitney* (*J. J. Geary*, of counsel), for appellants.

Holcomb, J.—Respondent, who operates a creamery at Glen Ullin, North Dakota, brought this action against appellants, butter and egg brokers, at Seattle, to recover damages upon alleged breach of contract to buy a carload of butter.   The contract was effected by means of the interchange of telegrams and letters between the parties, and was consummated on September 28, 1914, whereby appellants

[1]Reported in 163 Pac. 941.

agreed to pay 25 cents per pound for a carload of butter, to consist of grades known as extras and firsts, of light salt and light color, subject to buyer's inspection on arrival. The butter, consisting of 271 cubes weighing from 68 to 70 pounds each, aggregating 18,880 pounds, was consigned to respondent himself at Seattle, with a bank draft attached to the bill of lading, and subject to inspection. When the butter arrived in Seattle, on October 7, 1914, appellants inspected it and rejected it. Following the rejection of the butter, respondent, on about October 10, stored it in the warehouse of the Diamond Ice & Storage Company in Seattle in cold storage. The storage company was given no authority to sell the butter and all offers received by it had to be communicated to respondent in North Dakota. On November 30, the storage company, after communicating an offer to respondent, sold 100 pounds of the butter at 28 cents per pound. About the last of December, nearly three months after the butter had been rejected, the respondent placed it in the hands of W. E. Turner, a broker, with authority to sell. Without any notice to the appellants, Turner sold two cubes on December 28, at 26½ cents; 10 cubes on December 30, at 24 cents; 20 cubes on January 6, at 24 cents, and 138 cubes in Vancouver, B. C., on January 20, at 24 cents. The remaining cube was unsold and was returned to the respondent.

Appellants objected to all the testimony offered as to the receipts actually realized from the disposition of the butter, on the ground that the proper measure of damages is the difference between the contract price and the market price at the time and place of delivery.

The freight charge on the butter from Dakota to Seattle was $441.45. The storage charge amounted to $133.01. Commission and cartage charges amounted to $62.24, and charges for telegrams to $7.45. Evidence of these charges, particularly that for storage, was received over the objection of appellants.

There was undisputed testimony that on October 7, 1914, the day the butter was rejected, there was an established market price in Seattle, the place of delivery, of first class creamery butter from brokers to jobbers, and that price was from 31 to 33 cents; that that price continued in force until the end of November, when it declined one cent; that on December 17, the market price was from 29 cents to 30 cents, and on January 20, 1915, when the last sale was made by respondent's broker, it had fallen to 25 or 26 cents.

Appellants filed a cross-complaint for damages in the sum of $1,321.60, for breach of the contract to deliver the quality of butter contracted for as a loss of appellants' certain profits. The cause was tried by a jury and, at the close of respondent's case, appellants challenged the sufficiency of the evidence introduced to sustain any verdict in favor of respondent and interposed a motion for a directed verdict, which challenge and motion were denied.

The jury, after considering the case over night, failed to arrive at a verdict and returned on the following morning for further instructions. The court thereupon gave additional oral instructions, to nearly all of which appellant excepted. After the additional instructions, the jury returned a verdict for respondent in the sum of $620.42. It may be remarked, parenthetically, that this sum is about $23 less than the total of the freight, storage, commission, cartage and telegraph charges paid out by respondent. Motions of appellants for judgment notwithstanding the verdict and for a new trial were denied, and judgment entered on the verdict.

The verdict of the jury was evidently arrived at by allowing respondent the freight and storage charges and, in part at least, the commission and cartage charges as damages. The only possible theory upon which the evidence of the net receipts from the resale of the butter could have been admitted was that it was competent to establish the amount of the damages sustained. We take it that the law is well settled that, when goods are shipped pursuant to a contract

of sale and rejected at their destination, the proper measure of damages is the difference between the contract price and the market price at the time and place of delivery. *Schott Co. v. Stone, Fisher & Lane,* 35 Wash. 252, 77 Pac. 192. As was observed in that case, the utmost measure of the buyer's liability, had it taken the property, was the contract price. So the measure of its liability, after its refusal to take it and the seller had elected to keep it, was the difference between the contract price and the actual value of the property (or as in this case the market value of the property), if that value was less than the contract price. On the failure of the buyer to comply with the contract of sale, the seller had, of course, a choice of remedies: (1) It could store and hold the property subject to the buyer's order and sue for the contract price; (2) it could resell the goods, after notice to the buyer, and recover the difference between the price received and the contract price; or (3) it could retain the property as its own and recover the difference between the market value of the same at the time and place of delivery and the contract price, if the market value *was less* than the contract price. But as it elected to keep the property, it is clear that its measure of damages is found in the last of the three remedies mentioned.

In the case before us, there was no notice to the buyer of intention to resell the butter.

In this case, the butter was not consigned to the broker, but was consigned to the vendor himself, subject to inspection. After inspection, it was rejected. The title, therefore, never passed, but remained in the seller. The seller, in such cases, is not bound to resell, in order to ascertain the value; he may either resell or rely upon other evidence of value, at his option. If he does resell, he must, in order to have the result available as evidence of value, pursue, in substance, the same course as that required of a vendor who sells to enforce his lien; that is, he must sell in good faith, within a reasonable time, after notice in the customary man-

ner, and at the place of delivery; or, if there be no market there, then in the nearest and most available market. 2 Mechem, Sales, § 1650; 24 Am. & Eng. Ency. Law (2d ed.), p. 1140; *Lawrence Canning Co. v. H. D. Lee Mercantile Co.*, 5 Kan. App. 77, 48 Pac. 749; *First Nat. Bank of Mexico v. Ragsdale*, 171 Mo. 168, 71 S. W. 178; *Boston v. Alexander*, 185 Mo. App. 16, 171 S. W. 582; *Houston Packing Co. v. Dunn* (Tex. Civ. App.), 176 S. W. 634; Williston, Sales, § 582.

There having been no notice of intention to resell the rejected butter, appellants could not be bound by the price received therefor; especially since the evidence shows that the sale for the most part did not occur until more than three months after rejection, and was not at the time and place of delivery (or tender of delivery) or within a reasonable time thereafter. For the last reason, we think the items of storage and other charges in any event were improper and should not have been recovered.

When the court gave additional oral instructions to the jury, he instructed as follows:

"If you find for the plaintiff under the instructions of the court, if he performed his part of the contract—if he tendered the sort of butter he should have under the contract—the plaintiff should have received the $4,000 or more as pleaded. *Now, the plaintiff would be entitled to receive what he lost by reason of the defendant refusing to take the butter, and that would be arrived at, if he did lose anything, by adding together the total receipts which came into the hands of the plaintiff from the resale of these goods plus the expenses to which the plaintiff was put in the matter of freight to Seattle, and the expenses of storage in the matter of keeping it and in the matter of telegraph charges shown in the evidence. You will add together all the receipts for money obtained by the plaintiff from the resale of the goods through the Diamond Ice & Storage Company . . . you will add to that amount of money . . . the freight on the carload of butter, some $400 or more, and the storage charges and the telegraph charges. . . . Now, unless the plaintiff received as much from the net receipts as would amount to*

*$4,000 and some dollars, the amount of the contract price, he would be entitled to receive his damages against the defendant for the difference between the two. If he lost anything net he would be entitled to receive his damages against the defendant for the difference between the two. If he lost anything net he would be entitled to recover the net loss. . . . Did he receive that much from the resale of the butter taking into consideration the expenses to which he was put in the matter of conserving the property and reselling it, the storage and the telegrams sent?"*

From these instructions, it will be observed that the court submitted the case to the jury on the theory that, notwithstanding the fact that the jury might have found (as there was evidence tending to show) that the butter could have been resold at the time of, or within a reasonable time after, the rejection, and in fact for about two months thereafter, at considerably more than the contract price, of which, so far as the evidence goes, the respondent failed and refused to avail himself; yet if the appellants unreasonably rejected the butter, he would be entitled to recover as damages his freight and charges. The butter was his before rejection and after, since it was consigned to himself; the freight to be paid was his charge, and if he desired to retain the butter in the hope of a rising market, the storage charges were his to pay; and the other incidental expenses were all within the matter of the resale. The instructions given were wrong in any event.

The case must go back for a new trial. Another question raised by appellants which should be considered is that of submitting to the jury the question of what constitutes *extras* and *firsts* as grades of butter. That, of course, was right. It should have been submitted to the jury as a question of fact.

The judgment will be reversed and the cause remanded for a new trial.

ELLIS, C. J., MOUNT, PARKER, and FULLERTON, JJ., concur.