[No. 18035.   Department Two.   November 13, 1923.]

HARTMAN PACIFIC COMPANY, INCORPORATED, *Respondent,*
v. RUSH ESTEE *et al., Appellants.*[1]

SALES (143)—BREACH—DAMAGES—RESALE—REASONABLE TIME—
EVIDENCE—SUFFICIENCY.   Where a buyer of salmon refused to accept
delivery of the amount purchased, and the seller elects to sell the
balance and hold the buyer for the loss, he must do so within a
reasonable time; and such a resale was not within a reasonable time
where the first sale was four months after notice of the election when
the price had declined, and the last sale sixteen months after; and
there was testimony by men in the business that they could have
been sold on the market within two months after notice of election
at prices avoiding any loss.

Appeal from a judgment of the superior court for
King county, Ronald, J., entered November 17, 1922,
upon findings in favor of the plaintiff, in an action on
contract, tried to the court.   Reversed.

*Wright, Kelleher, Allen & Hilen* and *V. A. Mont-
gomery,* for appellants.

*Battle, Hulbert, Gates & Helsell,* for respondent.

MAIN, C. J.—This is an action to recover damages
for the alleged breach by the defendants of a contract
to accept and pay for 2,000 cases of "Tall Pink"
Alaska canned salmon.   The cause was tried to the
court without a jury, and resulted in findings of fact,
conclusions of law and a judgment sustaining a re-
covery by the plaintiff in the sum of $6,521.12, and
interest.   From this judgment, the defendants appeal.

The respondent is a corporation and is engaged in
the business of buying and selling salmon.   The ap-
pellants are copartners engaged in the brokerage busi-
ness in the city of Seattle under the name of the Sea-
board Company.   On September 16, 1919, the appel-

[1]Reported in 219 Pac. 867.

lants received what is called a "buying order" from a customer for six carloads of canned salmon. Thereafter, and on or about September 18, 1919, the appellants contracted to purchase from the respondent 5,000 cases of Tall Pink canned salmon at the agreed price of $2.15 per dozen, less 1½% and 2½% brokerage. This salmon, in due time, arrived in Seattle and delivery thereof was tendered on or about the 27th of October, 1919. At this time the appellants could not make delivery to their customer because the salmon had not arrived in time for delivery under the terms of the buying order. The appellants, after having examined the salmon, delivered to the respondent shipping instructions, that is, directions to ship salmon to certain customers. The respondent declined to make the shipments, claiming that the appellants had bought the salmon as principals and not as brokers. A good deal of discussion followed between the manager of the respondent company and the appellants over this question, with the result that the appellants accepted and paid cash for 3,000 of the 5,000 cases. The respondent, on or about December the 1st, tendered the remaining 2,000 cases and made a demand for payment, which was refused by the appellants.

On December 1, 1919, the respondent notified the appellants by letter that it would sell the 2,000 cases of salmon and hold the appellants for any loss sustained. The respondent subsequently sold the 2,000 cases, the first sale being made on April 19, 1920, at $1.75 per dozen, less 1½% discount, and the last sale on February 28, 1921, at 90¢, less 1½% discount. Between these two dates a large number of sales were made to various persons or corporations in small lots. Most of the sales were made through a brokerage firm in the city of Seattle. It will be noticed that the sell-

ing price was substantially less than that at which the respondent had contracted to sell to the appellants, and it was for this difference, together with the cost and expense of holding and selling the goods, that the present action was brought and judgment rendered as above indicated.

There is a controversy between the parties as to whether the respondent's manager, at the time the contract was made with the appellants, knew that they were acting as brokers and not as principals. There was a further dispute of fact between the parties as to whether, when the appellants accepted the 3,000 cases of salmon and paid for the same, there was an agreement that was to close the entire transaction, and that the appellants should not be required to take the remaining 2,000 over which the present controversy is waged. Upon both of these questions the trial court found against the appellants and in favor of the respondent, and, after a careful consideration of all the evidence, we are of the same view.

There is not much controversy over the law which is applicable to the question whether the respondent disposed of the 2,000 cases of salmon within a reasonable time, and there is little dispute as to the controlling facts. The respondent, having elected to sell the balance of the salmon and hold the appellants liable for the difference, was required under the law to sell in good faith, and, in the exercise of ordinary diligence, sell within a reasonable time. *Alden Speare's Sons Co. v. Hubinger,* 129 Fed. 538; *Carver, Frierson & Co. v. Graves,* 47 Tex. Civ. App. 481, 106 S. W. 903; *Thayer Export Lum. Co. v. Naylor,* 100 Miss. 841, 57 South. 227; *Hess v. Seitzick,* 95 Wash. 393, 163 Pac. 941. Whether a resale is unreasonably delayed must necessarily depend upon the facts and circumstances

of each particular case. *Armsby Co. v. Raymond Brothers-Clarke Co.*, 90 Neb. 553, 134 N. W. 174.

The final question then is whether the respondent sold the 2,000 cases of salmon within a reasonable time. From the facts above stated, it appears that the first sale was made about four months subsequent to the time that the respondent notified the appellants of its election to resell, and the last sale was made approximately sixteen months after. During the month of December, 1919, which was the month succeeding the notice of the intention of the respondent to resell, the price of salmon had receded a little owing to the fact that the Federal government was releasing and placing upon the market, especially in the east, a considerable quantity of canned salmon which had been packed during the previous year, 1918. Inquiry will be directed to whether, under the evidence, the respondent, by the exercise of reasonable diligence, could have sold the 2,000 cases of salmon within a period of three or four months after it had made its election to resell on December 1, 1919. There was introduced in evidence an editorial in the Pacific Fisherman for the month of December, 1919, and also the month of January, 1920, which the manager of the respondent company testified about explained the prevailing conditions. These editorials gave, as the prevailing price for salmon during those two months, about $2 per dozen. The manager of the respondent, when asked whether he could have sold the salmon at the prevailing market price as stated in the Pacific Fisherman during either of the months mentioned, replied, ''I am quite sure we could. Yes.'' Subsequently, on redirect examination, this was modified a little and the witness stated that it might have been sold ''at the offering price; it does not necessarily follow that I could have sold them either here or

elsewhere at that figure; I cannot state it for a certainty that I could have immediately disposed of them at that rate." The assistant sales manager of P. E. Harris & Company, fish cannerymen and brokers, was called as a witness by the respondent and testified on cross-examination that, during the month of December, 1919, "Pinks" could have been sold through the regular channels of trade at from $1.75 to $1.80 per dozen, and that in January and February, 1920, the market was if anything a little less active.

While the appellants were putting in their case, after the respondent had rested, this witness was again called to the stand and stated that, since giving his previous testimony, he had examined the records of sales of his company and found that Tall Pink canned salmon of good quality, during the month of December, 1919, was selling at from $2 to $2.25 per dozen. He further testified that, in his previous testimony, he was mistaken because "I got our invoices confused with some invoices of government returned stock." He also testified that his company sold, during the month of December, between four and five thousand cases of salmon, the price ranging from $2 to $2.25 per dozen, and that had he been called upon by the respondent to sell the 2,000 cases of salmon during the months of December, January or February, it could have been worked off at the same price that the other salmon was sold for. He testified further that, in January, his company sold 1,100 cases of salmon, and a like amount in February. The manager of the Kelley-Clarke Company, which does a general brokerage business with the salmon business as a specialty, and which is a good-sized concern, testified that in December, while the market had weakened to some extent, $2.10 per dozen would be approximately the prevailing price.

There seems to be no escape from the conclusion that, by the exercise of reasonable diligence, the respondent could have sold the salmon, within the next three or four months after December 1st, upon the market for a price of approximately $2 per dozen, which was only 15¢ less than that at which respondent had contracted to sell it to the appellants. This it did not do, but sold it upon a further receding market, beginning in the April following, and continued to dispose of it in small lots during the next nine or ten months at continually receding prices. It is true the trial court found that the salmon was sold within a reasonable time, but this is not a finding of fact upon substantially disputed testimony. It is rather a conclusion from the facts about which there can be little dispute.

It follows that the judgment must be reversed, and the cause remanded to the superior court with direction to enter a judgment in favor of the respondent for nominal damages only, and it is so ordered.

FULLERTON, PARKER, TOLMAN, and PEMBERTON, JJ., concur.